Thomas J. Salerno (AZ Bar No. 007492) tsalerno@ssd.com
Jordan A. Kroop (AZ Bar No. 018825) jkroop@ssd.com
**SQUIRE, SANDERS & DEMPSEY L.L.P.**
Two Renaissance Squire, Suite 2700
40 North Central Avenue
Phoenix, Arizona 85004-4498
(602) 528-4000

Counsel to Debtors-In-Possession

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF ARIZONA

| | |
|---|---|
| In re | Chapter 11 |
| LAUGHLIN RANCH, LLC, *et al.,* | Case No. 0:07-bk-00328-RJH |
| Debtors. | (Jointly Administered) |
| | **EMERGENCY MOTION FOR GRANT OF AUTHORITY TO AVION HOLDINGS TO IMPLEMENT CONFIRMED PLAN** |
| | **Hearing Requested: November 10, 2009** |

Laughlin Ranch, LLC and its affiliated, above-captioned debtors-in-possession (the "**Debtors**"), respectfully seek an order in furtherance of the Debtors' *Amended Joint Plan of Reorganization* dated August 5, 2009 (the "**Plan**"), which was confirmed by order of this Court on September 10, 2009, (a) compelling David Lords to sign certain documents required for the implementation and effectiveness of the Plan, and, in the interim, (b) granting authority to Avion Holdings to sign documents binding LR Renaissance, LLC to implement the Plan. This motion is brought on an emergency basis to avoid imminent and irreparable harm to the ongoing business of the Debtors and LR Renaissance.

This also constitutes a motion for an emergency hearing on this Motion. Immediate relief is needed in accordance with this Motion to avoid the inability of LR Renaissance to meet its payroll and operational obligations coming due as soon as the week of November 9, 2009. Without the immediate relief requested in this Motion, LR Renaissance's operations will be

forced to shut down to the substantial detriment of all stakeholders in these cases. Accordingly, the Debtors respectfully request that the Court set and conduct a hearing on this Motion as soon as possible. (Undersigned counsel is informed that time may be available on the Court's calendar for November 10, 2009 and respectfully requests a 15-minute slot during that day to conduct the requested hearing on this Motion.)

1.       The Plan's basic structure calls for the Laughlin Ranch properties and operations to vest in a newly-created entity, LR Renaissance, LLC, on the Effective Date of the Plan.[1] LR Renaissance is to be the borrower under the Exit Financing Facility from IMH. That financing is to provide the ongoing capital required to sustain and continue business operations at Laughlin Ranch from and after the Effective Date, which cannot occur until the Exit Financing Facility closes. The sole member of LR Renaissance is David Lords, but in accordance with the confirmed Plan, Lords is required to execute a Voting Trust Agreement in favor of Avion Holdings, giving Avion Holdings complete authority to manage and operate LR Renaissance in all respects from an after the Effective Date. A copy of the Voting Trust Agreement and a related Retention Agreement between LR Renaissance and Avion Holdings was attached as exhibits to the Plan and are attached to this Motion for the Court's convenience.

2.       To implement the confirmed Plan and bring about the Effective Date, LR Renaissance must execute the Exit Financing Facility documents, thereby obtaining necessary funding for continued operations at Laughlin Ranch. To facilitate these transactions, and the many other transactions required under the Plan, Lords was required to execute the Voting Trust Agreement and the Retention Agreement as of the Effective Date. Unless Lords executes those agreements, Avion Holdings may not have sufficient authority (despite the Plan's clear dictates) to manage LR Renaissance and executed the Exit Financing Facility documents on LR Renaissance's behalf.

3.       In anticipation of the Effective Date, Avion Holdings presented execution copies of the Voting Trust Agreement and the Retention Agreement to Lords at a face-to-face meeting

---

[1] Undefined, capitalized terms used in this Motion have the meanings given to them in the Plan.

on September 29, 2009. That same day, the Debtors' counsel provided those same agreements to Lords' counsel by e-mail. Since that date, now more than five weeks ago, Lords has inexplicably refused to sign the Voting Trust Agreement and the Retention Agreement. More recently, within the last two weeks, Lords has not responded to Avion Holdings' many attempts to reach him by phone and e-mail. Lords has not communicated with Avion Holdings for over two weeks. His current whereabouts are unknown to Avion Holdings, the Debtors' counsel, or (the Debtors' suspect) Lords' counsel.

4.      Lords' refusal to sign the Voting Trust Agreement and the Retention Agreement—critical components of the governance structure at the core of the reorganization called for in the Plan—has created an operational crisis because LR Renaissance cannot execute the Exit Financing Facility documents and obtain immediately-necessary operating funds. Without those funds, the Laughlin Ranch employees will not receive their next scheduled payroll, the Plan will not become effective, and the results of over two years of work to accomplish a successful reorganization of the Laughlin Ranch development will be jeopardized.

5.      Lords was an active participant in the Plan confirmation process and was given ample opportunity to assert any objection he may have had concerning the Plan, the Voting Trust Agreement, the Retention Agreement, the Exit Financing Facility, or any of the myriad other documents and features of this reorganization. Lords said nothing. His refusal now to cooperate with the implementation of the Plan is baseless and harmful to all creditors and the Laughlin Ranch operations and employees.

6.      For these reasons, the Debtors request that the Court: (a) order Lords to execute the Voting Trust Agreement and the Retention Agreement immediately; and, to avoid immediate harm to Laughlin Ranch's operations and employees, (b) immediately authorize Avion Holdings to assume the role intended by the Plan and to act for LR Renaissance to execute the Exit Financing Facility documents and any other documents necessary or appropriate to implement the transactions contemplated by the Plan.

Dated November 6, 2009

SQUIRE, SANDERS & DEMPSEY L.L.P.

By:  */s/ Jordan A. Kroop*
      Thomas J. Salerno
      Jordan A. Kroop
40 North Central Avenue, Suite 2700
Phoenix, Arizona 85004
(602) 528-4000
Counsel to Debtors-In-Possession

# VOTING TRUST AGREEMENT

# AMENDED AND RESTATED VOTING TRUST AGREEMENT

THIS AMENDED AND RESTATED VOTING TRUST AGREEMENT (the "***Agreement***") is entered as of the 21st day of September, 2009, between G. Neil Elsey (the "***Trustee***"), and David W. Lords ("***Lords***") and LR Renaissance, LLC, an Arizona limited liability company ("***LR Renaissance***," and collectively with Lords, the "***Trustors***").

<u>WITNESSETH</u>

WHEREAS, the Trustee previously entered into that certain Voting Trust Agreement dated as of June 13, 2007 (the "***Prior Agreement***") with certain entities owned and controlled by Lords, DWL Management, Inc. (f/k/a DWL Investments, Inc.), David W. and Michelle L. Carroll-Lords Trust and Laughlin Ranch, LLC (collectively the "***Interestholders***");

WHEREAS, as of the date of the Prior Agreement, the Interestholders collectively owned or controlled, directly or indirectly, interests (collectively, the "***Interests***") in numerous limited liability companies and other entities (the "***Affiliates***");

WHEREAS, pursuant to the Prior Agreement, the Interestholders agreed to transfer their Interests irrevocably to the Trustee for the Term of the Prior Agreement, and the Trustee agreed to accept such certificates and assignments and to act as the Interestholders' agent and attorney-in-fact with such irrevocable powers as are set forth therein;

WHEREAS, following the execution of the Prior Agreement, certain of the Interestholders and the Affiliates (collectively, the "***Debtors***") filed cases (the "***Chapter 11 Cases***") under Chapter 11 of Title 11 of the United States Code (the "***Bankruptcy Code***") as debtors-in-possession, on the United States Bankruptcy Court for the District of Arizona (the "***Bankruptcy Court***");

WHEREAS, on August 5, 2009, the Debtors proposed a plan of reorganization (the "***Plan***"), confirmed by the Bankruptcy Court on September 10, 2009, resolving the Chapter 11 Cases,

WHEREAS, as of the effective date of the Plan, LR Renaissance holds all the equity interests in Laughlin Ranch Golf Course, LLC, an Arizona limited liability company, Laughlin Ranch Restaurant, LLC, an Arizona limited liability company, and DWL Management, Inc., an Arizona corporation (collectively, the "***Reorganized Affiliate Debtors***"), which were Interestholders and/or Affiliates under the Prior Agreement;

WHEREAS, pursuant to the Plan, the Trustors have agreed to transfer the equity interests in LR Renaissance and the Reorganized Affiliate Debtors (collectively, the "***Issuers***") directly or indirectly owned or controlled by each of them (collectively, the

"**_Equity Interests_**") irrevocably to the Trustee for the Term of this Agreement, and the Trustee agreed to accept such certificates and assignments and to act as the Trustors' agent and attorney-in-fact with such irrevocable powers as are set forth herein.

NOW, THEREFORE, in consideration of the mutual premises, covenants and conditions contained herein, the parties hereto agree that the Prior Agreement is hereby amended and restated in its entirety as follows:

1.      Interests Subject to this Agreement.

The Trustors and Reorganized Affiliate Debtors referenced in the Recitals are parties to and otherwise subject to this Agreement, and the Trustors shall deposit with the Trustee the certificate(s) duly endorsed, affidavits of lost stock certificate(s), assignment(s) or other documentation evidencing transfer of such Interests, in the manner provided in Section 4 hereof.

2.      Irrevocability.

The Trustors hereby acknowledge that upon becoming parties to this Agreement that the deposit of the Equity Interests with the Trustee pursuant to this Agreement is irrevocable for the Term hereof, that such Equity Interests shall be held and administered by the Trustee in accordance with the terms hereof, and that, except as expressly provided herein, the Interestholders are not entitled to exercise any voting rights associated with such Equity Interests prior to the termination of this Agreement.

3.      Term.

Unless sooner terminated in the manner provided in Section 12 the trust created under this Agreement shall terminate on December 31, 2013.  The Trust shall thereafter renew, at the sole election of the Trustee for two additional one-year terms, unless the Trustee provides 30 days written notice (prior to the expiration of the then applicable portion of the Term) of nonrenewal (the "**_Term_**").

4.      Transfer of Equity Interests to Trustee.

(a)      The Equity Interests represent all of the Trustors' interests in each of the Issuers and all of the percentage ownership of each Issuer as set forth in the Recitals.  The Equity Interests have been validly issued, fully paid for and are non-assessable;

(b)      The Trustors shall deposit with the Trustee the certificate(s) evidencing ownership of the Equity Interests, duly endorsed in blank or accompanied by a properly executed assignment or affidavit of lost stock certificate, and in the case of membership units, written confirmations of the uncertificated nature of the units in the Issuer, all for transfer to the Trustee.  Except as expressly provided herein, during the Term and subject to the terms of this Agreement, the Trustee shall possess the title to the

Equity Interests and shall be entitled to exercise all rights of every kind and nature associated with the Equity Interests, including the right to vote the Equity Interests in person or by proxy;

(c)     The Trustee shall surrender the certificate(s) and/or affidavit(s) of shares for cancellation and shall cause new certificate(s) to be issued in the name of the Trustee.  Such certificate(s) shall bear, and the entry on the books of any Issuer that is a corporation showing the Trustee as owner of the shares, shall reflect the following legend:

> "The stock represented by this certificate is subject to restrictions and agreements contained in the Amended and Restated Voting Trust Agreement dated the 21st day of September, 2009, a copy of which is on file with the Issuer."

Each Issuer which is a limited liability company agrees that the Trustee shall have the absolute right, authority and power to cause entry on the books of such Issuer of the fact that the Trustee is the owner of the memberships interests thereof, and such books shall reflect therein the following statement:

> "The membership units in the Company are subject to restrictions and agreements contained in the Amended and Restated Voting Trust Agreement dated the 21st day of September, 2009, a copy of which is on file with the Issuer."

The Trustee is hereby fully authorized and empowered to cause such transfer to be made, and also to cause any further transfers of the Equity Interests to be made in accordance with this Agreement; and

(d)     Upon a Trustor's transfer of certificate(s) or other evidence of shares or the assignment of membership interests to the Trustee, the Trustee shall issue to such Trustor a Voting Trust Certificate or Certificates (the "*Trust Certificates*") in the form set forth on <u>Exhibit "A"</u> attached hereto and incorporated herein, for the same number of Equity Interests in each Issuer transferred by such Trustor.

5.     <u>Trust Certificates & Transferability</u>.

(a)     Each Trust Certificate shall be registered on the books established by the Trustee for such purpose in the name of the Trustor to whom such Trust Certificate was issued.  A Trust Certificate may be transferred, in whole but not in part, by the registered holder, in person or by attorney, only by surrendering such Trust Certificate to the Trustee for transfer on such books.  Upon such surrender of a Trust Certificate, the Trustee shall issue to the transferee a Trust Certificate for the same number of Equity Interests transferred as stated on the surrendered Trust Certificate.  By accepting such certificate, the transferee shall become a party to this Agreement.  Until such Trust Certificate is issued to the transferee, the Trustee shall treat the transferor as the owner

thereof for all purposes of this Agreement. Except as expressly provided herein, the Trustee may close such transfer books at any time prior to the holding of meetings, the payment of dividends, or for any other purpose.

(b)     In the event a Trust Certificate is mutilated, destroyed, stolen or lost, the Trustee may, in his discretion, issue a duplicate Trust Certificate, which shall be so marked, upon receipt of: (i) the existing Trust Certificate, if mutilated, or evidence of loss, theft or destruction, satisfactory to the Trustee; (ii) a written agreement by the holder of such Trust Certificate in a form satisfactory to the Trustee to indemnify and hold the Trustee harmless from any and all claims or liability arising from or relating to the issuance of such duplicate Trust Certificate; and (iii) payment of the Trustee's reasonable fees and expenses incurred in connection with the issuance of a duplicate Trust Certificate.

6.     Dividends relating to the Shares or Distributions Relating to the Memberships.

(a)     During the Term of this Agreement, the Trustors shall receive directly from the Issuers of the Equity Interests all payments of cash dividends, if any, declared with regard to shares, and shall receive all distributions with regard to membership interests.

(b)     In the event any dividend or distribution on such Equity Interests is paid, in whole or in part, in additional ownership interests in an Issuer, which have general voting powers, the Trustee shall receive the certificate(s) or other document(s) evidencing ownership of such interest directly from the Issuer and shall hold such certificate(s) under this Agreement. The Trustee shall issue to the Trustor entitled to such additional ownership interests, Trust Certificates representing such additional interest and such additional interest shall become additional interests subject to the terms of this Agreement. Trustors agree to execute any and all documents reasonably required by the Trustee to affect any such transfer of additional ownership interests to the Trustee pursuant to this Section 6(b).

7.     Dissolution of an Issuer.

In the event of the dissolution or complete or partial liquidation of an Issuer, whether voluntarily or involuntarily, the Trustor of such Equity Interests shall receive directly from the Issuer the monies, securities, rights or other property to which such Trustor shall be entitled relating to the Equity Interests.

8.     Reorganization of an Issuer.

In the event an Issuer is merged into or consolidated with another entity, or all or substantially all of the assets of an Issuer are transferred to another entity, the term "Issuer" shall include such successor entity for all purposes of this Agreement. The Trustee shall receive and hold under this Agreement any interest evidencing ownership of

the Trustors in such successor entity received on account of the Equity Interests held hereunder prior to such merger, consolidation and transfer. Trust Certificates issued and outstanding under this Agreement at the time of such merger, consolidation, or transfer may remain outstanding, or the Trustee may, in its discretion, substitute new Trust Certificates and the term "Equity Interests" as used herein shall include, without the necessity of any further action on the part of the Trustee or any other person or entity, any interest evidencing ownership of the Trustors in such successor entity received by the Trustee. The Trustors agree to execute any and all documents reasonably required by the Trustee to affect any such transfer of Equity Interests to the Trustee pursuant to this Section 8.

9.     Powers of Trustee.

(a)     The Trustee shall, in respect of all Equity Interests, possess and be entitled to exercise all of the Trustors' rights, including but not limited to, the right to vote and to take part in, or consent to, or dissent from, any action of the shareholders or members, manager or managing member of the Issuer, as the case may be, ordinary or extraordinary, by vote or in writing, including, without limitation, in the Trustee's sole and uncontrolled discretion (subject to the requirements of Section 10 of this Agreement):

(1)     The amendment, from time to time, of the articles of incorporation, articles of organization, certificate of formation, the bylaws and/or the operating agreement, including any and all amendments thereto now or hereafter existing, as the case may be;

(2)     The mortgage, hypothecation or pledge of properties and assets of any Issuer or of any part thereof;

(3)     The issuance of bonds or other obligations of any Issuer;

(4)     The guaranty of bonds or other obligations of any corporation or others;

(5)     The merger or consolidation of any Issuer with another entity or entities;

(6)     The sale, exchange, or other disposition, of all, or any part, of the franchises, properties and assets of any Issuer for such consideration, and upon such terms and conditions, as the Trustee may determine;

(7)     Changes in the number of directors of an Issuer which is a corporation;

(8)     The election and/or removal of officers and directors of an Issuer which is a corporation;

(9)     Increases or reduction of capital stock of an Issuer, which is a corporation, or in the membership of an Issuer, which is a limited liability company;

(10)    The reclassification or the elimination of classes of the stock of an Issuer which is a corporation, and the classification of authorized stock into preferred or different classes of preferred and common stock, with such preferences and rights as the Trustee shall deem advisable, or change in the par value thereof, or change of no par value stock to par value stock, or vice versa; the reclassification or the elimination of classes or series of an Issuer which is a limited liability company, and the classification of membership units into preferred or different classes or series with varying rights, powers, interests (economic or otherwise), tax attributes, distributable characteristics, and the like as the Trustee shall deem advisable;

(11)    The issuance of any additional stock, irrespective of the class thereof, of an Issuer which is a corporation, or in the membership units, irrespective of the class or series thereof, of an Issuer which is a limited liability company, of original or increase issue, for cash or property, upon such terms and conditions as the Trustee considers proper;

(12)    The dissolution of any Issuer, upon such terms and conditions and under such circumstances as the Trustee, in his discretion, determines;

(13)    Exercise any and all voting rights of a Trustor pursuant to the terms of the operating agreement of an Issuer which is a limited liability company; and

(14)    The performance of any other act or thing that any the Trustor is now, or may hereafter be, entitled to do or perform.

(b)     It is expressly understood and agreed that the holders of Trust Certificates shall not have any right by or under the Trust Certificates or under this Agreement, or otherwise, in respect of the Equity Interests, to vote or take part in or consent to any action of the Issuers, or to do or perform any other act or thing that holders of any ownership interest in the Issuers not subject to this Agreement are now, or may become, entitled to do or perform;

(c)     The Trustee, in his sole and absolute discretion, as to any particular matter or matters to be acted upon at any meeting of owners of a particular Issuer which the Trustee deems of an extraordinary nature and desires to have acted upon by the holders of the Trust Certificates, instead of voting stock as to such matter or matters, may execute and cause to be mailed or delivered to the registered holders of the outstanding Trust Certificates, proxies or powers of attorney, in such form as the Trustee may deem proper, authorizing the respective registered holders of the Trust Certificates to vote or act upon such matter in respect of the number of Interest in such Issuer represented by their respective Trust Certificates. The Trustee may, in his discretion, before voting or acting as to any such matter or matters, obtain the directions or consent of such portion of

the holders of Trust Certificates as the Trustee may deem advisable. Notwithstanding the preceding sentences, the Trustee may vote upon and has the full power and authority, so to do, any or all of such matters without requesting or obtaining any such directions or consent, or without giving any such proxies or power of attorney; and

(d)     The Trustee may exercise any power, or perform any act, by proxy, an agent or an attorney appointed in writing.

10.     <u>Action by the Trustee</u>.

(a)     The Trustee shall vote the Equity Interests on all matters on which the Trustors are entitled to vote, and all Equity Interests held under this Agreement shall then be voted in accordance with the determination of the Trustee;

(b)     In the event the Trustee fails to so vote the Equity Interests, the holders of the Trust Certificates shall cause the Trustee to vote the Equity Interests; and

(c)     The Trustee may vote for himself as any one or more officer positions or as director of any Issuer that is a corporation or the Managing Member or Manager of any Issuer that is a limited liability company and may accept employment with any Issuer.

11.     <u>Obligation of Trustee to Trustors</u>.

(a)     The Trustee is a fiduciary and, as such, occupies a position of trust and confidence with respect to each Trustor. Accordingly, in exercising his rights and fulfilling its responsibilities hereunder, the Trustee shall be required to act with the diligence of a prudent person in similar circumstances dealing with the property of others. In voting the Equity Interests held hereunder, the Trustee shall exercise his best judgment to select suitable directors of an Issuer that is a corporation or manager of an Issuer that is a limited liability company and shall, otherwise, participate as a Trustor in the management of such Issuer's affairs insofar as it may be entitled, so as to be apprised of the affairs of such Issuer;

(b)     Notwithstanding <u>Subsection 11(a)</u> hereof, the Trustee shall incur no liability to any Trustor or any third party for any mistakes or errors in judgment or for any act performed or omitted unless such mistake, error, performance or omission shall have been fraudulent, in bad faith, willful misconduct or gross negligence. Subject to the foregoing, the Trustors shall indemnify, defend and hold harmless, and pay all judgments and claims against the Trustee relating to any and all liability, damage and expenses (including attorneys' and experts [testifying and consulting] fees and costs) incurred by the Trustee in any matter in conjunction with the performance of his duties under this Agreement; and

(c)     The Trustee or any person, entity, or both, in which he may be, directly or indirectly, interested, or in which any of his associates, at any time, may be or

become, in any way and to any extent interested, may derive profit and advantage from the Issuers, or any successor, allied or subsidiary entities, or its or their stock obligations, properties, businesses and affairs, or in any and from any matter or thing, in any way, related to and in connection with the Issuers.

12.    Termination.

(a)    The trust created under this Agreement shall terminate upon the expiration of the Term set forth in Section 3 hereof.  The trust created under this Agreement may also be terminated sooner than such date in the event (i) of the Trustee's resignation pursuant to Section 13(b); or (ii) of fraud, bad faith, willful misconduct or gross negligence by the Trustee and the Trustee is notified, in writing, of such event by the holders of Trust Certificates.

(b)    Upon the termination of the trust created under this Agreement:

(i)    The Trustee, in exchange for and upon surrender of any outstanding Trust Certificates and upon the payment of any transfer tax, charge or deduction which the Trustee may be required to make, shall deliver to the registered holder of such Trust Certificate:  (1) certificate(s) for each Issuer that is a corporation for the number of shares represented by such Trust Certificate; and (2) assignment(s) of membership interest(s) for each Issuer that is a limited liability company for the number of membership units represented by such Trust Certificate.  The holder of such Trust Certificate shall deliver to the Trustee such Trust Certificates duly endorsed in blank for transfer and cancellation; or

(ii)    In the alternative, in the event deemed appropriate by the Trustee, the Trustee shall deposit with an Issuer that is a corporation such stock certificates, and in the case of an Issuer which is a limited liability company, then evidence of the Memberships, as are then held by the Trustee, duly endorsed in blank for transfer, for the number of shares of such Issuer, or in the case of an Issuer that is a limited liability company, then for the number of membership units therein, as are represented by the Trust Certificates then outstanding with respect to that Issuer, with authority, in writing, for the Issuer to deliver the said stock certificates, and in the case of membership units, then such membership units, in exchange for such Trust Certificates.

(iii)    Upon the delivery of all of such stock certificates to the holders of the Trust Certificates or upon delivery of all of such stock certificates to an Issuer as provided in Section 12(b)(ii) above, or upon the delivery of all of such membership units to the holders of Trust Certificates or upon delivery of all of such membership units to the limited liability company Issuer as provided in Section 12(b)(ii) above, the Trustee shall thereby be forever, fully and unconditionally released and discharged, as well as its agents and attorneys, from all liability and accountability under this Agreement of every kind, character and description whatsoever.  The Trustee shall make delivery or distribution of such certificates or membership units, as then case may be, for the Equity Interests to the person or persons whose names appear upon the books

of the Trustee as the owners of such Trust Certificates, and in doing so, shall be fully protected notwithstanding that any such Trust Certificates is not produced or surrendered.

13. Successor Trustees.

(a) The Trustee may appoint additional or successor trustee or trustees to serve in conjunction with or as successor to the Trustee; provided

(b) Any Trustee (and any successor Trustee) hereunder may resign, in his sole discretion, at any time by mailing to the remaining Trustees then serving, if any, and to the holders of Trust Certificates a written resignation, to take effect ten (10) days thereafter or upon the prior, written acceptance thereof. Upon the resignation, death, or incapacity of any Trustee, the remaining Trustees, if any, or, if none, the holders of the Trust Certificates, shall agree by a majority vote upon a successor who shall be appointed to fill the vacancy created by such resignation, death or incapacity; and

(c) As among the Trustees in the event more than one (1) Trustee is then serving, all questions arising shall be determined by a decision of a majority of the Trustees. The Trustees may, in all matters, act either at a meeting, or by writing with or without meeting, and the decision or act of a majority of the Trustees shall, in all matters, including exercise of the voting power, be deemed a decision or act of all the Trustees.

14. Compensation and Reimbursement of Trustee.

The Trustee shall serve without compensation. The Trustee shall have the right to incur and pay reasonable expenses and charges and to employ and pay reasonable expenses and charges of such agents, attorneys, and counselors as he may deem necessary and proper for carrying this Agreement into effect and in maintaining the same on an ongoing basis. All such expenses incurred by the Trustee shall be paid, or reimbursed to the Trustee, by the Trustors. Nothing contained in this Agreement shall disqualify or incapacitate the Trustee from serving as an officer, director, or manager, or in any other capacity for one or more of the Issuers.

15. Deposit of Copy.

A copy of this Agreement and of every supplement or amendment thereof shall be filed in the principal office of each of the Issuers, and shall be open at all reasonable times to the inspection of any owner of each Issuer, or any Trust Certificate holder under this Agreement.

16. Miscellaneous.

(a) Notices. Any notice or communication under this Agreement shall be delivered either personally or by mail, postage prepaid, to the addresses of the parties hereto, as the parties may from time to time provide to the Trustee for this purpose. A notice or communication delivered to a party to this Agreement at the most recent address

provided to the Trustee shall be deemed delivered immediately if delivered in person, or, if mailed, seventy-two (72) hours after deposit in the United States Postal Service mail.

(b)      Remedy at Law Inadequate.  The parties to this Agreement hereby declare that it is impossible to measure in money or money's worth, the damage that will accrue to a party hereto or to the beneficiary or estate of a deceased Trustor by reason of a party's failure to perform any of his or its obligations set forth in this Agreement. Therefore, if any party hereto or the beneficiary or estate of a deceased Equity Interest holder shall institute any action or proceeding to enforce any of the provisions of this Agreement, each and every party against whom any such proceeding is brought hereby waives the claim or defense therein that such party or beneficiary or estate has an adequate remedy at law, and no such parties shall urge in any such action or proceeding a claim or defense that such remedy at law exists.

(c)      Attorneys' Fees.  If any party to this Agreement finds it necessary to bring any action at law or in equity to enforce any of the terms of this Agreement, the party prevailing in any such action or proceeding shall be entitled to recover reasonable attorneys' fees and costs against the other party.  In the event a judgment is secured by such prevailing party, all such attorney's fees and costs shall be determined by the court and not by a jury and shall be included as a part of such judgment award.  For the purposes of this Agreement, the phrase "***prevailing party***" shall be that party who successfully attains, by award, judgment or settlement, substantially all of the relief originally sought by such party.

(d)      Arizona Law.   This Agreement shall be governed by and interpreted in accordance with the laws of the State of Arizona.

(e)      Time is of the Essence.  The parties to this Agreement agree that time is of the essence with respect to this Agreement.

(f)      Integrated Agreement.   This Agreement constitutes the entire understanding and agreement among the parties hereto with respect to these matters, and there are no agreements, understandings, restrictions, representations, or warranties among the parties other than those set forth herein or herein provided for.  The parties acknowledge the existence of the Amended and Restated Retention Agreement of even date herewith.

(g)      Amendments.  This Agreement may not be altered or amended, except by a writing executed by each of the Trustors and the Trustee.

(h)      Severability.  Every provision of this Agreement is intended to be severable.  In the event any term or provision hereof is declared illegal or invalid for any reason, such illegality or invalidity shall not affect the validity of the remainder of this Agreement.

(i)     Pronouns and Section Headings.  All pronouns and any variations thereof shall be deemed to refer to the masculine, feminine, the neutral or the plural, as the identity of the person or persons may require.  Section and other headings contained in this Agreement are for reference purposes only and are in no way intended to describe, interpret, define or limit the scope, intent, or extent of this Agreement or any provision hereof.

(j)     Further Execution.  The Issuers, the Trustors, and the Trustee hereby agree to execute, acknowledge and deliver any document or instrument, or both, that may be necessary or proper to carry out the purposes of intent of this Agreement.

(k)     Execution in Counterpart.  This Agreement may be executed in counterparts, all of which taken together shall be deemed one original.

(l)     Computation of Time.  In computing any period of time pursuant to this Agreement, the day of the act, date of notice or the event from which the designated period of time beings to run will not be included.  Days shall mean calendar days and the last day of the period so computed will not be included, unless it is a Saturday, Sunday or legal holiday in the state of Arizona, in which event the period shall run until the end of the next day which is not a Saturday, Sunday or legal holiday in the state of Arizona.

(m)     Parties in Interest.  Each and every covenant, term, provision, and agreement contained herein shall be binding upon and shall inure to the benefit of the heirs, successors and assigns of the respective parties hereto.

The parties have executed this Agreement as of the day and year first written above.

**TRUSTORS:**                                              **TRUSTEE:**

*LR Renaissance, LLC*, an Arizona limited            *G. NEIL ELSEY*
liability company

By:   _____            _____
         David W. Lords
         Its: Managing Member

*David W. Lords*

By:   _____
         David W. Lords

# RETENTION AGREEMENT

# AMENDED AND RESTATED RETENTION AGREEMENT

This Amended and Restated Retention Agreement ("***Agreement***") is made and entered into this 21st day of September, 2009 (the "***Effective Date***"), by and among LR Renaissance, LLC, an Arizona limited liability company ("***LR Renaissance***"), David W. Lords, the sole member of LR Renaissance ("***Lords***"), and Avion Holdings, L.L.C., a Delaware limited liability company ("***Avion***"). For the purposes of this Agreement, LR Renaissance, Lords, and Avion are collectively the "***Parties***" and each individually is a "***Party***."

## RECITALS:

A.     Lords, together with certain companies owned or controlled, directly or indirectly, by him (the "***Companies***"), and Avion have previously entered into the *Retention Agreement* dated as of June 13, 2007 (the "***Prior Agreement***"), whereby the Companies retained Avion to restructure, reorganize, and manage the Companies.

B.     Following the execution of the Prior Agreement, the Companies filed cases (the "***Chapter 11 Cases***") under Chapter 11 of Title 11 of the United States Code (the "***Bankruptcy Code***") as debtors-in-possession, in the United States Bankruptcy Court for the District of Arizona (the "***Bankruptcy Court***").

C.     On August 5, 2009, the Companies proposed a plan of reorganization (the "***Plan***"), confirmed by the Bankruptcy Court on September 10, 2009, resolving the Chapter 11 Cases.

D.     As of the effective date of the Plan, LR Renaissance holds all the equity interests in Laughlin Ranch Golf Course, LLC, an Arizona limited liability company, Laughlin Ranch Restaurant, LLC, an Arizona limited liability company, and DWL Management, Inc., an Arizona corporation (collectively, the "***Reorganized Affiliate Debtors***").

E.     LR Renaissance and Lords have executed the *Amended and Restated Voting Trust Agreement* dated September 21, 2009, which delivers all stock and membership interests of LR Renaissance and the Reorganized Affiliate Debtors (together with LR Renaissance, the "***Controlled Entities***") into the Voting Trust as described in that agreement (the "***Voting Trust***").

F.     Under the Plan, LR Renaissance, on behalf of itself and the Reorganized Affiliate Debtors, and Lords have agreed to execute this Agreement to retain Avion to manage the Controlled Entities following confirmation of the Plan by the Bankruptcy Court.

G.     Avion has agreed to provide such services, and Avion has agreed to contract with and make available to the Controlled Entities, during the term of this Agreement, the individual members of Avion on the terms and conditions stated in this Agreement.

H.     The parties acknowledge that Avion is foregoing other business opportunities in order to perform the management obligations contemplated by this Agreement.

**AGREEMENT:**

In consideration of the premises and for other good and valuable consideration, the receipt and sufficiency of which the Parties acknowledge, the Parties agree that the Prior Agreement is amended and restated in its entirety as follows:

1.  Engagement and Term.

    1.1  LR Renaissance, on behalf of itself and the Reorganized Affiliate Debtors, retains Avion for the purposes, among others, of managing and operating LR Renaissance and the Reorganized Affiliate Debtors for the Term of this Agreement. Avion accepts this engagement under the terms and conditions of this Agreement.

    1.2  The term of this Agreement ("*Term*") commences as of the date of this Agreement, and, unless modified by the Parties' written agreement, expires on the first to occur of: (i) the termination of the Voting Trust; and (ii) the sale of all or substantially all the Assets (defined below) of LR Renaissance.

2.  Duties, Responsibilities and Authority of Avion.

    2.1  Avion's duties and responsibilities include the management of, at LR Renaissance's cost: (i) staff and general operation of each Controlled Entity, including the immediate evaluation and retention (or termination) on behalf of one or more of LR Renaissance and the Reorganized Affiliate Debtors, of employees; (ii) record retention procedures; and (iii) financial oversight, including adoption and implementation of legal, accounting and bookkeeping matters as become appropriate. Avion has the authority, without limitation, to carry out the foregoing and perform all duties and actions contemplated by this Agreement. Avion has the authority to negotiate, agree to, and sign all necessary documents to bind LR Renaissance and the Reorganized Affiliate Debtors as necessary for Avion to carry out its duties and authority under this Agreement.

    2.2  Avion will provide, or cause to be provided for the benefit of LR Renaissance and the Reorganized Affiliate Debtors, at LR Renaissance's cost, additional third-party administrative, investigatory, legal, and accounting services as may, from time to time, be reasonably necessary or desirable.

    2.3  Avion will use its commercially reasonable best efforts and good faith in performing its duties and responsibilities under this Agreement, which include the obligation to communicate with the Controlled Entities, their officers and directors, their shareholders, their members, their managers, and their managing members. In addition, Avion will communicate and negotiate with the creditors of LR Renaissance and the Reorganized Affiliate Debtors.

    2.4  Avion will promptly provide and LR Renaissance will promptly pay Avion's monthly invoices.

3.  Compensation. Avion is entitled to receive an amount equal to the sum of Forty Two Thousand Dollars ($42,000.00) per calendar month (the "*Monthly Fee*"), with the first such payment due on execution of this Agreement and on the first business day of each successive

month. LR Renaissance, to the extent reasonably possible and only if available, must extend to the members of Avion such benefits as LR Renaissance regularly offers to its other senior management employees. At the election of LR Renaissance and Avion, the members of Avion may become direct employees of LR Renaissance, but on compensation not exceeding, in the aggregate, the amounts set forth in this Agreement.

4. <u>Reimbursement of Expenses</u>. During the Term, LR Renaissance must reimburse Avion for all ordinary and necessary out-of-pocket business-related expenses incurred by Avion on behalf of any of the Controlled Entities. Avion must maintain reasonable documentation or substantiation of such expenses so as to meet typically standard financial accounting auditing requirements.

5. <u>Termination of Avion</u>. During the Term of this Agreement, Avion may be terminated on a showing of Cause after appropriate notice and an opportunity for hearing before a court of competent jurisdiction. For purposes of this Agreement, "Cause" means willful misconduct or gross negligence or a material breach of a fiduciary duty, not cured after 30 days, and in those circumstances in which cure cannot be effected within such 30-day period, then within a reasonably acceptable cure period during which cure is being diligently pursued, following written notice from LR Renaissance in accordance with <u>Section 9</u> below. In the event of a final determination of Cause at such hearing, Avion's termination is effective immediately. On termination, Avion will be entitled to all unpaid monthly compensation and unreimbursed expenses through the date of termination.

6. <u>Termination by Avion.</u> If LR Renaissance defaults in payment of the Monthly Fee and such fee remains unpaid for a period of 30 days, Avion may send a notice, as provided below, to LR Renaissance of its intent to terminate this Agreement for default in payment. LR Renaissance will have 30 days to cure such noticed default. In the event that LR Renaissance does not cure such default within such 30-day period, Avion may terminate this Agreement. In such event, Avion retains its rights to the compensation as set forth in this Agreement.

7. <u>Indemnity, and Directors' and Officers' Liability Insurance Coverage</u>.

7.1 <u>Indemnity of Avion for Acts and Omissions of the Controlled Entities</u>. LR Renaissance must indemnify, hold harmless and defend Avion from and against any and all claims, demands, judgments, penalties, liabilities, costs, damages and expenses, whether incurred or claimed directly or indirectly, asserted in any form against Avion and which in any way relate to, or arise as the result of, Avion's duties and authority under this Agreement (the "***Company Indemnified Claims***"). This Indemnity includes all costs and reasonable attorney fees. This Indemnity does not apply to a particular Company Indemnified Claim if a court of competent jurisdiction determines that the Company Indemnified Claim at issue results from conduct that would constitute Cause for termination of this Agreement under Section 5 above.

7.2 <u>Indemnity of LR Renaissance for Acts of Avion</u>. Avion must indemnify, hold harmless and defend the Controlled Entities from and against any and all claims, demands, judgments, penalties, liabilities, costs, damages and expenses, whether incurred or claimed directly or indirectly, asserted in any form against LR Renaissance which in any way relate to, or arise as the result of Avion's willful misconduct or gross negligence in performance of its duties

or exercise of its authority under this Agreement (the "**_Avion Indemnified Claims_**"). This Indemnity includes all costs and reasonable attorney fees. This Indemnity does not apply if a court of competent jurisdiction determines that the Avion Indemnified Claim at issue results from the conduct of Lords.

       7.3   <u>Insurance Coverage</u>.  LR Renaissance must promptly obtain appropriate directors and officers liability (_i.e.,_ D&O and E&O) insurance coverage for the protection of Avion, its members, the Controlled Entities, and Lords. If such insurance coverage cannot be promptly obtained by LR Renaissance, this Agreement may be terminated by, and at the sole and absolute discretion of, Avion, but if LR Renaissance is able to obtain such insurance for Avion and its members on reasonable terms and conditions, then this Agreement may only be terminated as set forth in Sections 5 and 6 above. If LR Renaissance cannot obtain such insurance but Avion can obtain such insurance coverage, LR Renaissance still bears the cost of that insurance.

      8.   <u>Competition and Non-Disclosure Covenant</u>s.

       8.1   The Parties acknowledge that Avion and its members are involved in businesses, real estate investments, and other ventures other than LR Renaissance. Avion and its members are free to operate and manage other businesses and properties so long as they perform their duties and responsibilities under this Agreement.

       8.2   Other than for the benefit of the Controlled Entities, Avion and its members covenant and agree with LR Renaissance that, during the Term of this Agreement, neither Avion nor its members will in any way, directly or indirectly, disclose, or cause to be disclosed to any firm, entity, person, business or enterprise any confidential information relating to the Controlled Entities, except to the extent such information is: (i) in the public domain; (ii) required to be disclosed by governmental requirement, compulsion or order of court; (iii) provided to a party interested in pursuing a transaction relating to the Controlled Entities after execution of a normal and customary confidentiality agreement; or (iv) to employees or professionals retained by the Controlled Entities after execution of a normal and customary confidentiality agreement, or (v) disclosure of that information as may be necessary to fulfill Avion's duties under this Agreement or the Plan.

      9.   <u>Notices</u>.  All notices provided for by this Agreement must be in writing and are deemed received by the intended recipient: (i) on the business day that such notice is sent by telecopy or facsimile to the intended recipient if such notice is also sent by United States Mail, by certified mail, return receipt requested; (ii) the third business day after the date placed in United States Mail, certified mail, return receipt requested; and (iii) the first business day after notice is sent by express mail or other overnight mail service.  All notices must be delivered to the address indicated below, unless the party giving any such notice has been notified, in writing, of a change of such address:

       To Avion:       Avion Holdings, L.L.C.
                      15290 North 78th Way, Suite 204B
                      Scottsdale, AZ  85260
                      Facsimile:  (480) 905-0469

With a copy to:

Jordan A. Kroop, Esq.
SQUIRE, SANDERS & DEMPSEY L.L.P.
40 N. Central, Suite 2700
Phoenix, AZ   85004
Facsimile: (602) 528-4000


To LR Renaissance     David W. Lords
2909 Desert Vista Drive
Bullhead City, AZ  86429
Facsimile: (928) 754-2555

10.     <u>Representations and Warranties by LR Renaissance</u>.  As of the date of this Agreement, LR Renaissance represents and warrants to Avion as follows:

10.1     LR Renaissance is the owner of all of the outstanding membership interests or capital stock of each of the Controlled Entities;

10.2     LR Renaissance, on behalf of itself and the Reorganized Affiliate Debtors, has the legal right, power and authority to enter into and deliver this Agreement and to perform the transactions contemplated with respect to it hereby;

10.3     This Agreement has been duly executed and delivered by LR Renaissance and constitutes its legal, valid and binding obligation enforceable against LR Renaissance; and

10.4     Neither execution and delivery of this Agreement nor performance by any of the Controlled Entities of the transactions contemplated by this Agreement nor compliance by any of them with any provision of this Agreement will conflict with or violate or constitute a default under or a breach of (i) their respective articles of incorporation, by-laws or other organizational documents, (ii) any provision of applicable law, the violation of which would adversely affect in any material respect the transactions contemplated by this Agreement, or (iii) any judgment, decree, writ, injunction or order of any court or administrative or governmental authority or any arbitration board to which any of them is a party or by which any of them or any of their properties or assets are bound.

11.     <u>Representations and Warranties by Lords</u>.  Lords represents and warrants to Avion that he is the owner of all of the outstanding membership interests of LR Renaissance.

12.     <u>Representations and Warranties by Avion</u>.  Avion represents and warrants to LR Renaissance and Lords as follows:

12.1     Avion has the legal right, power and authority to enter into and deliver this Agreement and to perform the transactions contemplated by this Agreement;

12.2    This Agreement has been duly executed and delivered by Avion and constitutes its legal, valid and binding obligation enforceable against Avion; and

12.3    Neither execution and delivery of this Agreement nor performance by Avion of the transactions contemplated by this Agreement nor compliance with any provision of this Agreement will conflict with or violate or constitute a default under or a breach of (i) Avion's organizational documents, (ii) any provision of applicable law, the violation of which would adversely affect in any material respect the transactions contemplated by this Agreement, or (iii) any judgment, decree, writ, injunction or order of any court or administrative or governmental authority or any arbitration board to which Avion is a party or by which Avion or any of its properties or assets are bound.

13.    Assignability.  The parties agree that during the Term of this Agreement, Avion's rights to receive compensation under this Agreement may be assigned to any affiliate, after obtaining the prior, written consent of LR Renaissance and Lords, which consent may be granted or withheld in the sole discretion of any one or more of LR Renaissance or Lords; but Avion's duties, obligations and authority under this Agreement are not assignable, nor may, except by operation of law, any principal acceptable by LR Renaissance be replaced or withdrawn by Avion absent a default under this Agreement by one or more of the Controlled Entities.

14.    Unenforceability.  Unenforceability for any reason of any provision of this Agreement does not limit or impair the operation or validity of any other provision of this Agreement; but in lieu of such unenforceable provision, a provision as similar in terms to such unenforceable provision will be automatically added to this Agreement as may be possible and enforceable.

15.    Counterparts.  This Agreement may be executed in any number of counterparts, and by each Party in separate counterparts, each of which when executed is an original instrument, but all of which together constitute one instrument.

16.    Cooperation.  The Parties to this Agreement must cooperate with each other to execute and deliver such instruments and documents and take such actions as may be required, or as a Party may reasonably deem desirable, to effect the provisions and intent of this Agreement.

17.    Non-Waiver.  Failure of any party to exercise any right under this Agreement or to enforce any breach of this Agreement does not operate as a waiver of such right or breach, or of any other right or breach.

18.    Entire Agreement.  This Agreement represents the entire agreement among the Parties with respect to the subject matter of this Agreement and supersedes all prior agreements and understandings of the parties. No provision of this Agreement may be waived, altered or otherwise amended except by an instrument in writing signed by the Party to be charged. The Parties acknowledge that they have executed the Voting Trust Agreement.

19.    Attorneys' Fees and Jurisdiction.  If suit is brought or an attorney is retained by any Party to this Agreement to enforce the terms of this Agreement or to collect for the breach of this Agreement or for the interpretation of any provision of this Agreement in dispute, the prevailing Party is entitled to recover, in addition to any other remedy, reasonable attorneys'

fees, court costs, costs of investigation, and other related expenses incurred. If suit is commenced, attorneys' fees and taxable costs will be fixed by the court. The parties consent to the jurisdiction of any court of competent jurisdiction in Maricopa County, Arizona, which need not, but may be, a state court.

20.    _Construction and Interpretation_.  This Agreement is governed by and must be construed in accordance with the laws of the State of Arizona, without regard to its choice of law principles. The section headings above are for reference purposes only and do not in any way affect the meaning or interpretation of this Agreement. This Agreement must be construed according to its fair meaning and neither for nor against any Party irrespective of which Party caused the same to be drafted.  Each Party acknowledges that it has been, or has had the opportunity to be, represented by an attorney in connection with the preparation and execution of this Agreement.

21.    _Beneficiaries; Enforcement_.  This Agreement is intended solely for the benefit of the Parties and may not be construed to bestow any interests in or enforceable rights on any third party.

22.    _Binding Effect_.  This Agreement is personal in nature and may not be assigned by any Party without the prior written consent of the other Parties, except that the rights and obligations of LR Renaissance may be assigned in connection with the sale or transfer of the assets or membership interests of LR Renaissance. Subject to the foregoing, this Agreement is binding on and inures to the benefit of the heirs, administrators, representatives and permitted assigns of the Parties.

23.    _Capacity_.  Each person signing below represents and warrants that he is fully authorized to execute and deliver this Agreement in the capacity set forth beneath his signature.

*LR Renaissance, LLC*


By:    _____
        David W. Lords
        Its: Managing Member

*David W. Lords*


By:    _____
        David W. Lords, in his individual capacity

*Avion Holdings, L.L.C.*


By:    _____
        G. Neil Elsey, Manager